J-S38031-23

2023 PA Super 243

| | |
|---|---|
| IN THE INTEREST OF: A.R., A MINOR<br><br><br>APPEAL OF: R.O., MOTHER | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 1510 EDA 2023 |

Appeal from the Order Entered May 18, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000292-2021

| | |
|---|---|
| IN THE INTEREST OF: A.A.N.R., A MINOR<br><br><br>APPEAL OF: R.O., MOTHER | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 1511 EDA 2023 |

Appeal from the Decree Entered May 18, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000374-2022

BEFORE: LAZARUS, J., KUNSELMAN, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.:                    **FILED NOVEMBER 28, 2023**

In these consolidated cases, R.O. (Mother) appeals from the Decree and

Order entered in the Court of Common Pleas of Philadelphia County (trial

court) involuntarily terminating her parental rights to her daughter A.R. born

_____

* Retired Senior Judge assigned to the Superior Court.

in November 2020 (Child) and changing Child's permanency goal to adoption.[1] We affirm.

## I.

The Philadelphia Department of Human Services (DHS) became involved with the family when Child was born because of concerns regarding Parents' ability to care for Child, who was born with extensive health issues. Child has been diagnosed with CDK-13 (a rare genetic disorder marked by cardiac issues), sleep apnea and lymphoma in the brain. Child has difficulties swallowing, is fed through a feeding tube, is at risk for aspiration and needs constant monitoring. At the time Child was born, Mother resided in an assisted living facility due to an intellectual disability and mental health issues and Father did not have stable housing. Child was adjudicated dependent in April of 2021 and was placed with her current Foster Parents in March of 2021 when she was four months old. She has been in their continuous care since that time.

DHS filed petitions to terminate the parental rights of Mother and Father and change Child's custody goal to adoption in June of 2022. The trial court held hearings and argument on the petitions on August 10, 2022, April 24,

---

[1] The parental rights of Child's biological father, C.R. (Father) were also involuntarily terminated and he has filed an appeal. We have issued a Memorandum in that case at J-S38016-23 (1508 & 1509 EDA 2023). Mother and Father (collectively, Parents) have another daughter, G.R., who is not a subject of this appeal.

2023 and May 18, 2023, at which several witnesses testified, including Mother, Father, Foster Mother C.S., Dr. William Russell and Caseworkers Janay Pollard and Michelle Jackson. At the time of the proceedings, Child was about two years old. Parents were residing together in a two-bedroom apartment in North Philadelphia and Foster Parents' home is located in Perkasie outside of Philadelphia in Bucks County. Parents had been offered weekly supervised visits at a Willow Grove facility with Child and her younger sister G.R., who also resides with Foster Parents.

**A.**

At the August 2022 hearing, Mother testified that she and Father had attended virtual and in-person visits with Child, but they missed some of the visits because of illness and transportation issues. When Mother was asked how she interacted with Child during the visits, she stated, "[Child] doesn't like me." (N.T. Hearing, 8/10/22, at 19). Mother indicated that she does not feed Child because Child eats through a feeding tube. Although Mother acknowledged that Child needs a great deal of medical care, she was unable to identify Child's specific medical needs. (*See id.* at 22). With regard to Child's numerous medical appointments, Mother explained that she and Father did not regularly attend them because of problems with transportation. When asked how she feels towards Child, Mother stated, "I love her to death. You know, even though she doesn't like me, I still love her." (*Id.* at 36).

Father similarly testified that he and Mother did not attend several visits with Child because of either illness or employment obligations. (*See id.* at 45-46). Father described Child's medical condition as serious in that "she can pass at any time if she doesn't receive the right medicine." (*Id.* at 48). However, Father was unable to list Child's medications and has never fed her using the feeding tube. At the time of the first hearing, Father had steady employment at Rite Aid as a cashier. He testified that his parents and siblings reside close by and are able to provide him with family support. (*See id.* at 56-57). Father testified that during visits with Child, he interacts with her using music, books and toys and she has crawled towards him during some visits. Father stated that he has a bond with Child and that if the trial court permits reunification, he would be willing to do an in-depth study of Child's medical needs. (*See id.* at 60, 69).

Caseworker Janay Pollard testified that she began working with the family in January of 2022 and that she oversees the Foster Parents and supervises the visits with Parents. (*See id.* at 70-71). For the virtual sessions, Parents would typically log on for about five to ten minutes and then log off because of connection issues. During the in-person visits, Parents needed prompting to remove soiled items during diaper changes and often did not arrive with basic items they were expected to bring such as diapers, change of clothes and toys. During the visits, Father interacted with Child and Mother only with G.R, and Mother did not talk with Child at all. Ms. Pollard

relayed that there were safety concerns during the visits, including an instance where Child started to put a toy down her throat and Father insisted that this was fine. She opined that in the approximate six-month period she had observed Parents, neither of their interactions with Child had improved and they were unable to identify safety concerns or appropriately meet Child's needs. Ms. Pollard observed no bond between Mother and Child, and when Child cried, Mother did not attempt to develop a bond with her and simply said "she doesn't like me." (***Id.*** at 87).

Foster Mother described Child's medical conditions in depth for the trial court and explained that Child's breathing has to be constantly monitored, "when she sleeps, how she sleeps, when she's raised." (***Id.*** at 107). An overnight nurse comes to their home and she and her husband take turns monitoring Child throughout the day. Because of her brain abnormalities, Child is globally developmentally delayed, any changes in her body have to be monitored because of pituitary gland abnormalities, her heart rate has to be monitored because of a heart defect, and she takes medications for asthma. Foster Mother has attended all of Child's medical appointments and she estimated that in the last six months Child has had about 17 appointments wherein Parents have called in only three times and attended in person twice. (***See id.*** at 113-115). During the appointments, Parents do not meaningfully engage with the physicians or ask questions. Foster Mother testified on cross-

examination that she has nine children in her care, five of whom have medical needs.

**B.**

At the April 24, 2023 hearing, Dr. William Russell testified as an expert in parenting capacity and forensic psychology. Dr. Russell conducted a parental capacity evaluation for Mother in September of 2022 and found that Mother "was aware that she would not be able to handle raising" Child given her medical needs and Mother did not think Father was capable of handling them either. (N.T., 4/24/23, at 9; *see id.* at 10-11). Dr. Russell explained that Mother has been diagnosed with an intellectual disability, bi-polar disorder and post-traumatic stress disorder, and he opined that there were no services or support that could be put in place to enable Mother to appropriately care for Child. Dr. Russel clarified that he had not conducted an evaluation of Father and he, therefore, could not draw any conclusions about Father's capacity to parent Child. (*See id.* at 23).

Caseworker Michelle Jackson testified that she was assigned to this case in March of 2021 when Mother was living in an adult facility and Father did not have housing. Parents have since obtained suitable housing and Ms. Jackson's understanding regarding their plans was for Father to work while Mother stayed at home. (*See id.* at 30). Ms. Jackson indicated that Father's employment with Rite Aid had ended and although he had advised her of new employment at a carpet cleaning business, he had not provided paystubs.

Regarding Parents' attendance of Child's medical appointments, she testified that DHS provided bus passes to them to cover transportation and they were given lists of all appointment times/doctors' office locations. During the supervised visits, Ms. Jackson observed that Child did not engage with Mother at all and she recalled one visit where Mother "was very overwhelmed [and] was upset" and Foster Mother helped to calm Child down. (*Id.* at 49). Mother needed prompting throughout the visit as to diaper changes and to begin activities like reading books. Ms. Jackson testified that Foster Parents provide Child with all of her basic needs such as food, shelter and clothing, take her to all medical appointments and care for all of her special medical needs. She also testified that Mother nor Father knows how to care for Child's medical needs.

With regard to Child's demeanor, Ms. Jackson described her as "very feisty, very happy. She is extremely determined . . . she's accomplishing more than what was expected at this time. She really has come a very long way[.]" (*Id.* at 55-56). During visits, Child approaches and engages with her Foster Parents and is "very attached and bonded to [Foster Parents], always laughing, smiling." (*Id.* at 56). Ms. Jackson opined that adoption is in Child's best interests because Foster Parents have been providing her with a "strong, loving safe environment" and that termination of Parents' parental rights would not cause Child any type of emotional stress because "she does not have a relationship with either parent." (*Id.* at 58, 60).

Father testified concerning his employment that he is working at a carpet cleaning company and that he has been the sole source of financial support for him and Mother. (*See id.* at 134). If reunification were permitted, their plan would be for Mother to be at home caring for Child while he works, which he believes she is capable of doing. (*See id.* at 141-42).

## C.

As part of closing arguments, counsel for Mother asserted that in this case, application of the Adoption Act to terminate Mother's parental rights based on her intellectual disability violates the Equal Protection Clauses of the Pennsylvania and United States Constitutions, citing *In re D. L. R.*, 432 A.2d 196 (Pa. 1981). (*See* N.T. Hearing, 5/18/23, at 22-24). The trial court rejected this argument and noted that counsel was relying on a non-binding dissenting opinion to support her position.[2] (*See id.* at 53-54).

At the conclusion of the hearing, the trial court issued its ruling involuntarily terminating the parental rights of Mother and Father to Child pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8) and (b) and changing Child's permanency goal to adoption. In doing so, the court noted the difficult

---

[2] Counsel relied on a dissenting opinion issued by Nix, J., stating: "Today, the majority of this Court has forged beyond the fundamental tenets of American jurisprudence by approving the order of the Orphans' Court of Erie County which involuntarily terminated the parental rights of the mother, F. O. R., because of her [intellectual disability]." *In re D. L. R.*, *supra* at 197 (dissent).

circumstances of this case and found that all witnesses testified credibly; Mother and Father are unable to parent Child and were unable to articulate her basic medical needs and diagnoses; Mother had very limited interaction with Child during their supervised visits and during that time Child would cry; Mother herself expressed that she could not take care of Child; despite this acknowledgment, Father indicated that there were no issues with Mother caring for Child while he was working to support the family; Mother has no bond with Child and termination of her parental rights would not have any detrimental effect on Child; although Father and Child share some bond and positive interaction, termination of his parental rights would not have a detrimental impact given the missed visits and length of time Child has been in care; Foster Parents have functioned and will continue to function as Child's parents; a goal change to adoption is appropriate for Child given her complex medical issues, young age and placement in a medical foster home willing to adopt.  (**See** N.T. Hearing, 5/18/23, at 54-61).  Mother timely appealed and she and the trial court complied with Rule 1925.  **See** Pa.R.A.P. 1925(a)(2)(i)-(ii).[3]

---

[3]

> Our standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse

*(Footnote Continued Next Page)*

**II.**

We begin by outlining the basic legal principles that guide our review.

Section 2511 of the Adoption Act governs termination of parental rights and

requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the trial court determines that the parent's conduct warrants termination of his or her parental rights does the trial court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re S.C.*, 247 A.3d 1097, 1103 (Pa. Super. 2021) (citation omitted).

"A child has a right to a stable, safe, and healthy environment in which

to grow, and the child's life simply cannot be put on hold in the hope that the

parent will summon the ability to handle the responsibilities of parenting." *Id.*

(citation omitted). When a parent has demonstrated a continued inability to

conduct her life in a manner conducive to providing a safe environment for a

---

> of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020) (citation omitted).

child, and the behavior is irremediable as supported by clear and competent evidence, the termination of parental rights is justified. *See id.* at 1105.

In this case, the trial court terminated Parents' rights pursuant to Sections 2511(a)(1), (2), (5),(8) and (b), which provide as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement

- 11 -

of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A §§ 2511(a) (1), (2), (5), (8) and (b).

**A.**

Mother first contends that the trial court's application of the Adoption Act to terminate her parental rights violated her right to equal protection under the law pursuant to the Pennsylvania and United States Constitutions by terminating her parental rights based solely on her intellectual disability. **See** App. Br. at 13, 16-28. Mother asserts that the trial court "did not address the equal protection issue or conduct an equal protection analysis" and that the trial court essentially required her to "alleviate her Intellectual Disability – it's not something that can be cured." **Id.** at 16-17. Mother contends that the net result is that the Adoption Act creates two classes of persons—those that are disabled and incapable of parenting such as herself—and those who are not disabled—and that the trial court failed to address her equal protection argument during the proceedings. (**See id.** at 16-18, 28).

After review of the record, we conclude that it does not support Mother's claims. First, the notes of testimony show that the trial court did consider Mother's equal protection argument and expressly rejected it, as evidenced by the trial court pointing out that Mother relied on a non-binding dissenting opinion to support her contention. That dissenting opinion stated that that case "presents a single issue: may mental incapacity justify a permanent, involuntary termination of parental rights. Restated, does the Adoption Act . . . . authorize the involuntary termination of a mother's rights **solely** on the grounds of [intellectual disability]. *In re D. L. R.* at 197 (1981).[4] The trial court did not terminate Mother's parental rights just because she was intellectually disabled, but because it found that she was unable to care for

---

[4] Our Supreme Court entered a very short opinion which stated in its entirety that:

> The Orphans' Court entered a decree terminating appellant's parental rights in her child. Appellant contends that the evidence was insufficient to support the decree. After carefully reviewing the record, we find appellant's contention to be without merit. Appellant's continued incapacity has caused her child to be without essential parental care and such incapacity cannot or will not be remedied. *See In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978), cert. denied, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 192 (1978); 1 P.S. s 311(2). The determination of the Orphans' Court is supported by competent evidence and will not be reversed. *See In re J.L.Z.*, 492 Pa. 7, 421 A.2d 1064 (1980). Decree affirmed. Each party to pay own costs.

*In re D. L. R*., 495 Pa. 55, 56, 432 A.2d 196, 197 (1981).

- 13 -

the needs of the Child. To hold otherwise would require us to focus on her needs instead of the best interests of the Child.[5]

Second, generally, an intellectually disabled person's parental rights may not be terminated without a showing that he or she is presently unable to provide adequate care for a child and will continue to be unable to do so for the foreseeable future. **In re P.A.B.**, 570 A.2d 522, 528 (1990). This two-pronged test applies in the case of intellectually challenged parents as well as abusive or neglectful parents. **Id.** This test has to be met by clear and convincing evidence as well as the fact that termination would be in the best interests of the child. Because the factors used to determine whether parental rights are to be applied equally to all persons whose parental rights are terminated, there is no equal protection violation and that test was met here.

We agree with the trial court that there was clear and convincing evidence that Mother was unable to provide adequate care for the Child and her incapacity could not be remedied making termination was warranted under Section 2511(a)(2)." Mother testified that Child did not like her and threw tantrums when she tried to hold her and otherwise did not meaningfully

_____

[5] Though not raised here, we have previously rejected an Americans with Disabilities Act (ADA) equal protection challenge to a termination of parental rights. **In Int. of J.J.L.**, 150 A.3d 475, 481 (Pa. Super. Ct. 2016), where we stated that to accept that "Mother's assertion [that her rights were being violated] would require the trial court and this Court to ignore the best interests of the Child and focus instead on the needs of Mother. This we cannot do." **See also In re D.C.D**.,105 A.3d 662, 673–74 (Pa. 2014).

interact with Child. Mother acknowledged her inability to care for Child's complex medical needs and Father's inability to do the same, leaving them unable to parent her as a unit under the very difficult circumstances of this case where Child's life could be jeopardized by a relatively simple mistake. Because Mother's equal protection argument lacks both factual and legal support, no relief is due.

**B.**

Mother next challenges the trial court's best interests analysis pursuant to Section 2511(b). (*See* Mother's Brief, at 28-31). Mother acknowledges that her bond with Child is "slight" but argues that any assessment of Child's long term emotional needs is premature and speculative. (*See id.* at 30).

We begin by observing that the goal of the Juvenile Act is to "preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1). The Act is additionally intended to "prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." ***Interest of A.M.***, 256 A.3d 1263, 1273 (Pa. Super. 2021) (citation omitted). In considering Section 2511(b), we are guided by the following principles:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond,

if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**D.R.-W.**, *supra* at 914 (citations omitted).

In this case, although Mother claims that a best interests analysis is premature and speculative, Child has resided with Foster Parents for more than two years, from the time she was just a few months old, and has never been parented by Mother and Father. Despite the opportunities for visits with Child and to become actively involved in her medical care by attending appointments, the record reflects that Parents have put forth minimal effort to work towards establishing a parental role in Child's life. Multiple credible witnesses testified to their observation that Mother has no bond with Child, that she is incapable of taking care of the Child, and that termination of parental rights would have no detrimental impact on Child. Mother has agreed with this bond assessment during her own testimony. In contrast, Child shares a close parent/child bond with Foster Parents who have provided for her extremely complex and specialized needs during her entire life. Because the evidence supports the trial court's conclusion that termination of Mother's

parental rights would best serve Child's needs and welfare, we affirm its order pursuant to Section 2511(b).

**C.**

Finally, Mother argues that the trial court abused its discretion in changing the goal of the dependency proceedings from reunification to adoption, as this change was not in Child's best interests. However, because we have concluded that the trial court did not abuse its discretion in granting the petition to terminate Mother's parental rights, this issue is moot. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) ("The effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption.") (citation omitted). Accordingly, we affirm the order changing the permanency goal from reunification to adoption.

Even if we were to reach the merits of this issue, we would conclude that no relief is due.

> When deciding whether to change the permanency goal in a dependency action, the trial court must consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

> Additionally, a court is required to provide compelling reasons why it is not in the best interest of the child to return to

his or her parents and to instead be placed for adoption. 42 Pa.C.S. § 6351 (f.1)(5)(iv)(C). The child's best interest, safety, permanency and well-being must take precedence over all other considerations in a goal change proceeding. The parent's rights are secondary and a goal change to adoption may be appropriate, even under circumstances where a parent substantially complies with a reunification plan. A court cannot subordinate a child's need for permanence and stability to a parent's claim of progress and goals for the future.

*Interest of A.M.*, *supra* at 1273 (case citations omitted).

Here, Child was adjudicated dependent shortly after she was born with a rare genetic condition and Mother and Father did not have appropriate housing or the ability to care for Child's extensive medical needs. During her time in their care, Foster Parents have helped Child make great progress, well beyond what was expected by DHS. Child is bonded with Foster Parents and is happy and thriving in their home. Because the record supports the trial court's decision to change the permanency goal to adoption, no relief would be due.

Decree affirmed. Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/28/2023

- 18 -